**Alan S. WALTERS \*, Petitioner,**

v.

**Tami R. HUMPHERIES, Respondent.**

File No. CN10–02395.
Petition Nos. 12–31409,
12–34733, 13–28573.

Family Court of Delaware,
New Castle County.

Submitted: March 14, 2014.

Decided: April 1, 2014.

Sean M. Lynn, Esquire, Baird Mandalas Brockstedt, LLC, Dover, Delaware for Petitioner, Alan S. Walters.

Jennifer Hartnett, Esquire, Hartnett & Hartnett, Hockessin, Delaware for Respondent, Tami R. Humpheries.

OPINION

COONIN, Judge:

Before the Court is a Petition for Modification of Custody filed on September 3, 2013 by Alan Walters (hereinafter "Fa-

---

\* Pseudonyms have been assigned to the parties and witnesses and other identifying informa-

tion has been modified in order to maintain confidentiality.

ther"), represented by Sean M. Lynn, Esquire, with regard the parties' minor child James Walters (d.o.b. 8/24/2009) (hereinafter referred to as "Child"). On September 27, 2013 Tami Humpheries (hereinafter "Mother"), represented by Jennifer Hartnett, Esquire, filed an Answer to the Petition for Modification of Custody. Also pending before the Court are two Motions for Modification of Visitation. Mother filed a Petition to Modify Visitation on September 19, 2012. Father filed an Answer to Mother's Motion on October 18, 2012. Father also filed a Petition for Modification of Visitation on October 18, 2012 and then filed an Amended Petition for Modification of Visitation on December 3, 2012.

### Procedural History

The parties entered into a Consent Order of Custody and Visitation on or about June 30, 2010. Mother filed a Petition for Modification of Visitation on September 19, 2012. Mother requested Father be granted visitation every other weekend from Saturday at 6 p.m. until Monday morning. Mother also requested that Father have visitation with Child every Wednesday after school until 6:30 p.m. On October 18, 2012, Father filed an Answer to the Motion for Modification of Visitation stating that he did not agree with the visitation schedule requested by Mother. Father filed his own Petition for Modification of Visitation on October 18, 2012. Father requested visitation with Child Monday afternoon through Wednesday morning as well as every other weekend from Saturday at 8 p.m. until Monday morning.

On November 1, 2012, Father filed a Petition for Modification of Custody wherein Father requested sole legal custody of Child as well as primary residential placement. On November 19, 2012, Father filed a Motion to Consolidate both parties' pending Petitions for Modification of Visitation with Father's Petition for Modification of Custody. On December 3, 2012, Father filed an Amended Petition for Modification of Visitation in which he requested sole legal custody of Child as well as primary residential placement. On January 4, 2013 the Court granted Father's Motion to Consolidate and scheduled the parties for mediation on January 14, 2013.

The parties appeared before the Court on February 21, 2013 and agreed that the parties would share joint custody of Child and Mother would retain primary residency; however, the parties were unable to agree to a visitation schedule. The Court entered an Order on January 25, 2013 granting Mother and Father joint legal custody of Child with primary residence with Mother. The parties were to continue an interim visitation schedule under which Father was to have visitation with Child every other weekend from Friday at 7:30 p.m. until Sunday at 6 p.m. and every Wednesday evening from 5:00 p.m. until 7:30 p.m. A hearing on the issue of visitation was scheduled for May 2, 2013.

The parties appeared before the Court on May 2, 2013 and Father advised that he wished to withdraw his consent to joint custody and reopen the matter for consideration. The Court advised Father that the matter had been resolved by order dated February 21, 2013 and the matter would not be relitigated in the proceeding. The parties represented to the Court that they had been unable to reach an agreement with regard to visitation but stated the interim schedule was acceptable during the school year until the matter could be resolved at a full hearing. The parties also agreed that during the summer Father was to have visitation every other week from Friday at 7:30 p.m. until Sunday at 6:00 p.m. in addition to every Tuesday from 3:00 p.m. to 7:30 p.m. However,

the parties were unable to agree upon extended summer vacation visitation. By Order dated May 6, 2013 the Court ordered custody of Child would remain vested jointly with Mother and Father and with primary residence to be with Mother. Father was to have summer visitation as agreed by the parties and he was to have two one week visitation periods to be scheduled on weeks between those during which Father was entitled to Monday and Tuesday visitation. A hearing on the issue of future summer visitation was scheduled for September 9, 2013.

On September 3, 2013 Father filed a Petition for Modification of Custody requesting sole custody and primary residential placement with Father on the grounds that Mother had relocated with Child to Maryland without Father's consent. Father also filed a Motion to Consolidate the parties' Petitions for Modification of Visitation with Father's Motion for Modification of Custody. On September 9, 2013, Mother filed an Answer to the Motion to Consolidate requesting the Motion be denied on the grounds that Mother had insufficient time to address the new issues raised in the Petition for Modification of Custody prior to the scheduled hearing. On September 16, 2013 the Court entered a Scheduling Order consolidating the issue of visitation with the modification of custody and scheduled a hearing. The Court granted Father visitation every Tuesday from 3:40 p.m. until 6:00 p.m. and every other weekend from Friday at 7:30 p.m. until Sunday at 6:00 p.m. with pick-up and drop-off at the Middletown, Delaware Wawa store. On September 27, 2013, Wife filed a Response to Father's Petition for Modification of Custody requesting that the modification be denied.

On October 22, 2013, Father filed Motion for Discovery and Request for Production of Documents. On October 30, 2013, Mother filed an Answer to the Motion for Discovery requesting the Court deny Father's Motion for Discovery. On November 14, 2013, the Court entered an Order Permitting Discovery which limited the number of interrogatories that could be served by either party. On January 21, 2014, Mother filed an Emergency Motion for a Protective Order regarding the taking of a third party deposition to which Father filed a response on January 24, 2014. The Court held a teleconference on March 18, 2014 and Father agreed that the case could go forward without the deposition. The Court held a full hearing on the merits on February 21, 2014 and March 14, 2014.

### Discussion

For the sake of judicial economy, the Court will not repeat in detail all of the testimony that can be obtained from the record, but will note the salient testimony as it pertains to the required statutory analysis. This Court has not previously entered a final Order on the custodial, residential, and visitation arrangements for the Child except by agreement of the parties. Therefore, the Court must consider the best interests of the child together with an analysis of the factors under 13 *Del. C.* § 722. They are as follows:

### Best Interest Factors

#### (1) The wishes of the child's parent or parents as to her custody and residential arrangements;

Currently, the parties share joint legal custody of the Child with primary residential placement with Mother. Father has visitation with Child every Tuesday from 3:40 p.m. until 6:00 p.m. and every other weekend from Friday at 7:30 p.m. until Sunday at 6:00 p.m. Father is seeking sole legal custody and primary residential placement in his home. Father believes

that it is in Child's best interest to reside with Father because Father can provide a stable living environment for Child.

Father contends that Mother's living environment is unstable as she and her husband, Maxwell Marsh, have a history of break-ups and domestic violence. On January 15, 2014 there was an incident between Mr. Marsh and Mother in their Maryland home after which Mr. Marsh was arrested and is currently facing criminal charges. Mother also sought a Protection from Abuse Order against Mr. Marsh after the incident occurred. Father introduced an email sent to him by Mother in which Mother claimed that she sought a PFA because Mr. Marsh had physically held her against her will and attacked her physically and that Mr. Marsh had threatened to hurt her again.[1] Mother testified on the day following the incident Mr. Marsh returned to his and Mother's home and "turfed" the yard. Father claims at the time of the second incident Child was in the home and recounted that the incident was horrible to his step-sister Kylie.[2] However, both Mother and Mr. Marsh deny the Child was in the home at the time the incident occurred.

Father testified that there were other incidents of domestic discord between Mother and Mr. Marsh which resulted in Mother moving Child on multiple occasions. Mother lived with Mr. Marsh at 202 Beetle Road in Wilmington until the couple ended their relationship due to an argument. Father asserted that Mother moved into her mother's home at 400 North Dunkin Street in Wilmington. Mother and Mr. Marsh then reconciled and Mother returned with Child to the marital home. After the altercation between Mother and Mr. Marsh on January 15, 2014 Mother once again moved out of

the home and into a home in New Castle, Delaware.

Father has concerns about the effect the numerous moves are having on the Child and the environments which Mother is subjecting Child to in these homes. Father testified that he was extremely concerned when Mother moved in with Child's maternal grandmother because Mother's family has serious issues. Father claimed that maternal grandmother and Mother's siblings have all been in and out of jail and have drug dependency and domestic violence issues. Mother's husband, Mr. Marsh, confirmed that when he and Mother were living together he had taken affirmative steps to keep Child away from Mother's family because of their numerous issues including incarceration and drug use. While Father indicated that he believes Mother's home in New Castle is appropriate, she is residing with a woman he does not know, and Mother does not have any type of lease that grants her a legal right to remain in the home. Mother did not call as a witness the individual in whose home she resides.

Father also alleges that Mother was abusing prescription medications during their relationship and believes she continues to do so. Mother has been in several motor vehicle accidents and has health issues for which she has been prescribed pain medications. Father contends, however, that he has seen Mother take too much of the medication on several occasions and become unaware of her surroundings. Father also asserts that when Mother does not have her medication she becomes extremely volatile. Mother's husband, Mr. Marsh, testified that when Mother has her pills she is at her best and when she does not have her pills she is at

---

1. See Petitioner's Exhibit 4.

2. See Petitioner's Exhibit 7.

her worst. Mr. Marsh denied Mother had a drug problem; however, he made several statements to Father's wife through Facebook messaging such as: "I never had drama before. When her pills run low then it starts" and "I have to manage her pills."[3]

Father claims that in addition to her prescription medication, Mother often takes several medications which she is not prescribed and often mixes medications. Father testified that while the parties were in a relationship he often observed Mother and her family members sharing medications as a part of a "drug exchange." Father claims that Mother and her family members would discuss who had what pills and how they were going to get different prescription medications. Father worries about Mother's drug use around Child because when she is using she is unaware of her surrounding and has severe mood swings.

Mother denies having a drug problem or that she has ever sold any of her prescription medication. Mother stated she would never sell her own medication because she needs the medication which she is prescribed. Father recounted an incident where a man came to the door of their former home and Mother went upstairs and then returned an exchanged something with the man and Father believed this to be a drug exchange. Mother, however, claimed that the man who came to the door was a retired construction worker who was building a deck on the home and had come to the home to get money for building supplies.

Father also claims that Mother is behaving inappropriately at custody exchanges in front of Child and this is having a negative impact on Child. Father testified on several occasions Mother had become very upset during the exchanges and began berating him and shouting profanities at Father in Child's presence. Father introduced two recording of custody exchanges occurring January 26, 2012[4] and January 29, 2013[5] in which Mother can be heard shouting expletives and becoming increasingly irate and hostile toward Father. Father also introduced a recording of a custody exchange on July 13, 2013[6] in which the Child can be heard asking Mother to "stop being mean to my daddy."

Mother admits that she did act inappropriately during one custody exchange as she had just found out Father was in a new romantic relationship with his current wife and was very upset. Mother testified that she had never acted inappropriately in front of her Child before and after doing so immediately called Father and asked if she could meet with him and Child in order to apologize. Mother stated that she never wanted Child to see her in that light or think that she feels that way about Father. Father admitted that Mother did apologize after this incident. Mother claimed on another occasion in which she got into a heated discussion with Father and his wife during an exchange she asked Child to go into the house so he did not witness the parties' discussion. Father stated that Mother had acted inappropriately and has yelled and cursed at him at more than ten custody exchanges while Child and his step-daughter are often present.

Father also claims Mother attempted to coerce him to drop his pursuit of custody of Child. Father testified Mother informed him that he was being investigated

3. See Petitioner's Exhibit 16.

4. See Petitioner's Exhibit 6.

5. See Petitioner's Exhibit 8.

6. See Petitioner's Exhibit 7.

by the FBI for skimming money from his employer as well as in connection to a gambling/drug ring and that the FBI had contacted her for information. Father stated that Mother told him that she would be willing to help him as long as he was willing to come to some type of compromise regarding custody. Father testified that the FBI investigation is a complete falsity and he was never being investigated for any wrongdoing. No evidence was proffered to corroborate Mother's claims.

Mother testified that she should retain primary residential placement of Child because her son belongs with her as she has been his primary caregiver since birth and she wants her son to remain living with her. Mother would like the current visitation schedule with Father to remain in place but states that she is willing to be flexible with Father's work schedule. Mother would like Father to have full and open contact with Child. Mother testified she believes it is very important for Child to have a strong male role model in his life and Mother reinforces positive thoughts and feelings about Father to Child.

Mother claims that Father's work schedule allows him an insufficient amount of time to spend with Child and Child would spend the majority of time with a third-party caregiver should Child primarily live with Father. Father is currently employed as the Director of Operations for Golden Place. Mother claims that while she and Father were a couple Father worked extremely late hours and did not have much extra time to spend with Child. Father testified that he generally works forty-five (45) hours during the week and has consistent days off and a flexible work schedule. Father generally is off on Monday and Tuesday during the summer and Sunday and Monday during the off-season. Father concedes he works longer hours in the summer and can work as late as 9:00 p.m. Father testified that he is able to spend all of his time while not at work with his son and Father's wife is willing to resign from her employment in order to be home with Child. Mother also asserts that Father's employment obligations have resulted in Father canceling several Tuesday evening visits with Child. Father denies that he has been canceling his Tuesday visitation but rather asserts Mother has been denying him Tuesday visitation on the premise that Child is repeatedly ill. Father testified that he has been denied visitation between eight (8) and ten (10) occasions since September of 2013.

Both Mother and Father desire residential placement of Child. While Mother asserts Child should remain in her care because he has always been with her and she can spend more time with Child than Father, Father asserts Child should be in his care because of several troubling assertions about Mother's behavior. After reviewing the testimony of each party, the Court finds the assertions made by Father to be credible and thus find this factor favors Father's position.

*(2) The wishes of the children as to their custodian(s) and residential arrangements;*

Because of the tender age of the Child, the Court did not conduct an interview with Child in regard to his wishes on the custodial arrangement.

*(3) The interaction and interrelationship of the child with her parents, grandparents, siblings, person cohabiting in the relationship of husband and wife with a parent of the child, any other residents of the household or person who may significantly affect the child's best interests;*

Father resides in a four (4) bedroom single family home in Milford, Delaware

with his wife Faith Moats and step-daughter Kylie Lannister who is six years old. Father reported that Child has a wonderful relationship with his step-mother and has formed a very close bond with his step-sister Kylie and the two children play very well together. Ms. Moats testified that she loves Child and would like him to live with her and Father on a full-time basis. When Father is working, Ms. Moats often cares for Child when he is visiting their home. Father also testified that Child has a very close relationship with his paternal grandparents who reside in the area and are very involved in his life. When neither Father nor Ms. Moats can watch the child due to work obligations, paternal grandmother cares for the child. Child also has a close relationship with Father's extended family. Father's sister Allison Walters often takes Child on outings such as the zoo and child enjoys playing with the children of Father's brother Dale Walters.

Mother currently resides in a three (3) bedroom home in New, Castle Delaware with Child and her roommate Gloria Lancombe. Mother has known Ms. Lancombe for five years and she acted as Mother's therapist for a brief period of time. Ms. Lancombe is in her sixties and considers Child to be like a grandson. Mother testified that she does not have a lease agreement with Ms. Lancombe and pays no rent; however, Ms. Lancombe informed Mother that she could stay in the home as long as she needed to. Mother testified that she offered Father on multiple occasions the opportunity to meet Ms. Lancombe but he refused. Father, however, asserted that Mother has never offered to introduce him to Ms. Lancombe and to date he has never met her.

While Mother is currently residing with Ms. Lancombe as a result of her separation from her husband, Mr. Marsh, Mother testified that she and Mr. Marsh have not yet decided on the future of their marriage. Mr. Marsh was diagnosed with bipolar disorder subsequent to the incident of domestic violence between he and Mother and Mother testified that if his disorder was the cause of the incident then she would be willing to work through her issues with Mr. Marsh. Mr. Marsh continues to reside in the parties' home in Maryland with his daughter Natalie. Mother testified that Child loves all of his older sisters.

Although neither party disputes that Child has a loving relationship with both Father and Mother, the relationship between Father and Mother and each other's spouses has been extremely unstable. Father described his relationship with Mother as erratic, uncomfortable, and borderline volatile. Father admitted that he restricts his communication with Mother because their communication is upsetting to both his wife as well as Mother's husband. As previously mentioned, Father claims that Mother is extremely hostile toward him at visitation exchanges and has flown into rages in front of Child and his step-daughter which result in her shouting and using obscenities. Mother has also thrown objects at Father during exchanges which could have hit Child who was sitting in the back seat of the case at the time. Father attributes the inconsistencies in Mother's mood to her abuse/dependency of prescription medication.

There has also been violence and hostility in the past between Mother and Father's wife, Ms. Marsh. In a series of Facebook messages between Ms. Moats and Mother's husband Mr. Marsh, Ms. Moats described Mother as "a piece of garbage," "a whore," and "the devil walk-

ing on earth."[7] Mr. Marsh testified it was Ms. Moats who informed him where Mother was living after Mother retained a Protection from Abuse Order against him. Father testified that he and Mother were at the New Castle County Courthouse for mediation on April 8, 2013 when Mother and Ms. Moats got into a physical altercation which resulted in charges for both women. Mother claims that Ms. Moats was the aggressor in the argument and that she did not assault her in any way. Mother was charged with Disorderly Conduct by Fighting or Violent Tumultuous or Threatening Behavior and Ms. Moats was charged with Offensive Touching and a "No Contact" Order was entered. Father stated that after the entry of the "No Contact" Order, Mother called the police on three separate occasions claiming Ms. Moats had violated the Order and in each instance Mother's claims were untrue. All charges of violation of the "No Contact" Order by Ms. Moats were later dismissed. Mother claims the charges were dropped because Father pleading with her to not pursue the charges while Father denies ever doing any such thing.

Father currently has a stable living home environment with his wife and stepdaughter who each have a positive relationship with Child. Mother, conversely, is involved in a tumultuous relationship and does not have a home in which it can be assured that she will continue to reside. The Court is extremely concerned about what appears to be an extremely toxic relationship between not only Mother and Father but also their respective spouses. The animosity between all the members of Childs life has the potential to be extremely damaging to Child as he grows older. Though both parties appear to feed into the negativity of the relationship, because Father has a more stable and supportive

living environment, the Court finds this factor favors Father's position.

### (4) The child's adjustment to her home, school and community;

Child has been residing primarily with Mother since his birth; however, Mother has moved on several occasions throughout Child's short life. Mother recently moved to New Castle, Delaware with Child after the domestic violence incident between herself and Mr. Marsh in January 2014. Prior to the move, Mother resided in Northeast, Maryland with Child and Mr. Marsh. Mother moved to Maryland in spite of a Petition for Modification of Visitation pending in the New Castle County Family Court and no Court Order authorizing her relocation. Mother testified that she believed the custody issue had been resolved in May of 2013 when she and Father agreed that she could retain primary residency although she admitted that she was aware the issue of summer visitation was still pending. Mother stated at the time she moved she believed they would be using the home only as a summer home and not a permanent home although she and Mr. Marsh had rented out their home in Delaware and therefore had no home in Delaware in which to return. Father testified that he found out Mother purchased a home in Maryland through Facebook and she represented to him that it would be only a summer home. Prior to moving to Maryland in July of 2013, Mother resides with the Child in Mr. Marsh's home for one year. Although Father claims that Mother moved out of Mr. Marsh's home and into her mother and grandmother's home due to domestic strife, Mother denies ever moving out of the home. Mother testified that she and the child would stay with her grandmother

for periods due to grandmother's illness but she and Child never "lived" in the home. Father testified he believed that Mother was living in the home with her mother and grandmother for a period of three to four weeks because Mother had told him to pick the Child up there as she had moved out of the home with Mr. Marsh due to a fight.

Child is currently attending preschool at the Brussels Elementary Montessori Program in Wilmington, Delaware. The program groups children based on their strengths and challenges in different age ranges. Child enjoys participating in problem solving activities in the classroom but is struggling with symbol recognition. Mother testified that she is very involved with Child's schooling. Mother brings Child into school each morning and gets him comfortable and ready for the day and talks with his teacher. Mother also participates in classroom celebrations and volunteers in the class each Wednesday for two and a half hours. Child's teacher Ms. Hitch–Trimpy testified that Mother does attend classroom celebrations and has spent three days in the classroom but made no mention of Mother volunteering in the classroom on a weekly basis.

Child was previously attending the Montessori Program in Newark but Mother relocated the child to the Wilmington program because Mother has concerns regarding the way the teacher was running the classroom and the parents' access to the classroom in Newark. Father testified that he was not consulted regarding the decision to change the location of Child's school and simply received an email on a Friday stating Child would be moving to a different school on Monday.[8] Father claims he has expressed to Mother numerous times in the past that he wants to be involved in decisions regarding Child's ed-ucation. Mother admitted while she did not discuss with Father the actual move to another school when a spot opened up for Child, Mother stated that she and Father had multiple conversations about the issues with the classroom including Child being touched inappropriately by another student. Father stated that he was aware of some issues but Mother did not inform him of every occasion that Child had been touched inappropriately. Mother also testified that Father never expressed an issue with the transfer prior to the hearing and she believed the parties were in agreement about the change.

Father is concerned that Child's school attendance while in Mother's care has been very poor. Child's teacher Ms. Stacy Hitch–Trimpy testified that as of February 20, 2014 Child had 54 absences and/or tardies and has missed approximately fifty percent of school for the year. Ms. Hitch–Trimpy, however, admitted that she does not always put doctor's excuses in the system because Child is in preschool and not actually required by law to be in attendance. Ms. Hitch–Trimpy also stated that she was aware that several of the absences were as a result of doctor's appointments for Child's skin rashes as Mother would text her when Child would be missing school for a doctor's appointment. Mother testified that other than two occasions Child's absences have all been the result of illness and that she sends in a doctor's note to the school when she can remember. Ms. Hogan Tietze was Child's teacher in Newark the previous year and felt that compared to last year Child was more withdrawn socially and emotionally because he came into the classroom late and misses a lot of school. Ms. Hogan Tietze also felt that child's issues with symbol recognition may be a

---

8. See Petitioner's Exhibit 9.

result of his lack of attendance. Ms. Hogan Tietze also noted that since mid-January Child is much more withdrawn and very clingy to Mother.

Mother has been unable to provide Child with a stable home environment in his short life and has been unable to ensure that Child attends school on a regular basis. Although Child is currently in preschool and not obligated by law to attend, the pattern of allowing Child to remain home from school fifty percent of the time cannot continue if the Child is to reach his full educational potential and thrive socially. While Mother claims Child was ill she has not been diligent in documenting these illnesses to Child's school and thus the Court doubts that all of these absences were as a result of legitimate medical issues. Because Mother cannot provide Child with stability either at home or at school, the Court finds this factor favors Father's position.

### (5) The mental and physical health of all individuals involved;

Father is in good physical and mental health and has no reported issues. Mother testified that she suffers from a bone degenerative disease. As a result of the disease Mother's bones are not solid and more prone to breakage. Mother explained that if she overexerts herself one day she will likely be in severe pain the following day. Mother also noted that the disease makes it very difficult for her to drive for long distances and requires that she takes frequent breaks. Mother also explained that the disease results in her muscles being very sore and there are days when it is difficult to even write her name. Mother emphasized that in spite of her disease she can take care of an active four-year-old child. Mother also explained that she has a herniated disk in her back on which the doctors would like to do surgery; however, she has declined.

As a result of the bone degenerative disorder and injuries from multiple past car accidents, Mother is currently prescribed twenty (20) milligrams of the painkiller Kadian twice per day and is prescribed twenty (20) Oxycontin per month. Mother asserts that she has been taking the pain medication on and off for approximately four years but did take pain medication in 2000 for a year as a result of injuries from a car accident. Contrary to her husband's claims in Facebook messages, Mother denies that Mr. Marsh ever had to manage her pain medication and stated that her medication was managed by her prescribing physician. Mother is also seeing a psychiatrist as she suffers from depression as well as panic attacks. Mother is currently prescribed Zoloft and Xanax as needed for her depression. Mother testified that she began taking these medications after the birth of Child and denied that she has been prescribed these medications for the past ten years. Father, however, testified that Mother has been using narcotics and antidepressants since 2000 and he has never known her to cease using these medications.

Child suffers from the skin condition Pityriasis Lichenoides Chronica ("P.L.C."). The condition results in ongoing skin rashes that range from mild to inflamed. Mother explained that that Child's P.L.C. occasionally flares up and results in painful bumps. Child is currently prescribed the topical cream Elidel for his P.L.C. and Mother testified that she has been experimenting with other creams and lotions in order to sooth the rash. Mother stated that she is now using a new cream which has greatly improved Child's skin within the past month. Mother expressed concern regarding Father's care of Child's P.L.C. as she alleges that Child often re-

turns from Father's care with his skin in a flare-up. According to Mother, she has attempted to have discussions with Father regarding the types of products he is using in his home and whether these products could be causing Child's flare-ups but Father gets agitated and claims Child is fine at his home. Father, however, stated that Mother provided him with all medications necessary for Child as well as information regarding ways to decrease the severity of the outbreaks such as using a certain type of laundry detergent. Father testified he follows all directions given by Mother and applies Child's medication to the rash when necessary although there have been occasions when Mother has failed to provide him with the necessary medication.

Mother testified that Child was diagnosed with out-of-sync disorder ("OSD") at age two when Mother became concerned that Child had not yet commenced speaking. Mother explained that OSD is a sensory disorder which is very low on the autism spectrum. Child was evaluated by the Easter Seals and speech and food therapy were implemented for approximately one year while the parties were still living together. Mother testified that while she was involved in the therapy, Father declined to be involved unless he was told that he actually needed to be present. Father testified that he was present and involved in Child's therapy in spite of being told after an initial evaluation by the Easter Seals that Child was functioning normally and many children begin speaking late.

Mother testified that as a result of Child's OSD he at one point had an issue with large crowds and loud noises and would often have "meltdowns" in public. Mother admitted that Child's teacher did not testify to any meltdowns occurring while Child was in school but stated that was because Child has made huge strides in school and no longer has meltdowns while in school. Mother asserted that Father has observed these meltdowns while the parties were together and after their separation has called Mother on several occasions to ask Mother how to deal with Childs' screaming and crying. Father, however, stated that he has never observed the child have any adversity to crowds or loud noises and Child had never suffered any type of alleged meltdown. Father testified that he recently took Child to a St. Patrick's Day parade where there was a large crowd and several loud fire trucks and Child had no issues whatsoever and greatly enjoyed himself.

Mother testified that Child is sick quite frequently because his immunity is lower than other children his age. Mother stated that as a result of his low immunity Child becomes ill quickly and remains ill much longer than other children. Mother testified that when child was two-years-old he was on antibiotics for an entire year and has been on antibiotics on and off this entire past year. Mother testified that as a result of frequent illness Child also had surgery to have tubes placed in his ears and his adenoids removed. Mother testified that when Child was last tested by his doctor, Child's immunity was in the normal range; however, he can still get sick like any other child. Mother expressed her concern over Child living primarily with Father because Father does not address Child's health issues and believes mother exaggerates Child's illnesses. Father testified while he Child clearly suffers from P.L.C., he does believe that Mother overstates the remainders of Child's medical issues. Father stated that while in his care Child is almost never sick and Father has never seen Child vomit or complain of a headache. Father also asserts that Mother often informs him Child is sick on Tuesdays when he is scheduled to have evening visitation with the Child and Fa-

ther had visitation with the Child the preceding weekend, inferring that these alleged illnesses are designed to minimize Father's contact with Child.

Mother also believes that Child should primarily reside with her because Father is not actively involved in Child's medical care. Mother testified that she has attended one hundred percent of Child's doctor's appointments while Father has attended only five percent of the appointments, with most being recently. Mother testified that in spite making a recent appointment for Child at the Children's Hospital of Pennsylvania after consulting with Father regarding the date, Father failed to appear at the hospital. Father, conversely, believes Mother intentionally provided him with the wrong date so that he could not attend the appointment. Father testified that he has attended seventy five percent of the medical appointments he has been made aware of by Mother and always attends appointments that Mother informs him are important. Mother also claimed that when Child was in the hospital to have tubes placed in his ears, Father came to the hospital but only visited for five minutes. Father, to the contrary, testified that he went to visit Child at the hospital and spent much longer than five minutes with Child after he got out of surgery. Father also alleges that Mother did not include him in the decision for Child to have the surgery and sent him an email only after she had discussed the surgery with Child's doctors and the decision had already been made.[9]

Father claims that in spite of the parties sharing joint legal custody of Child, Mother makes medical decisions unilaterally despite Father expressing a desire to be involved. Father testified and Mother admitted that Father had contacted her several times regarding the doctor that was

treating Child for strep throat.[10] Mother denies that she refused to provide Father with this information as he alleges. Mother stated that she emailed Father the information to Father on multiple occasions but Father told her he had never received them.

While Mother's medical issues may prevent her from doing some daily tasks, there was no evidence presented that she is unable to function adequately in order to take care of Child. The Court is concerned, however, with Mother's use of narcotic prescriptions and antidepressants and finds credible Father's testimony that as a result of Mother's use of these medications she becomes unaware of her surroundings and highly volatile which could endanger Child. While Mother and Father disagree as to the severity of Child's medical issues and Mother asserts that Father does not adequately address Child's medical concerns, the Court finds that both parents are committed to addressing any medical issues which Child may have. The Court finds more credible Father's assertion that Mother makes unilateral decisions regarding Child's medical care and may at times intentionally keep him from being involved with these decisions, only informing him after she has decided a course of action she alone believes appropriate. Because of the Court's concern about Mother's prescription drug use as well as Mother's refusal to allow Father to meaningfully participate in Child's medical care, the Court finds this factor favors Father's position.

**(6) Past and present compliance by both parents with their rights and responsibilities to their children under § 701 of this title;**

Pursuant to 13 *Del. C.* § 701, parents are responsible for the support, care, nur-

---

9. See Petitioner's Exhibit 10.

10. See Petitioner's Exhibit 11 and 12.

ture, welfare, and education of their children. On June 6, 2010, a Permanent Consent Order for New Support was entered which required Father to pay $1000 per month in current support. Father testified that he is current on his child support obligation and has no arrears.

Mother testified that she is not currently employed and while Father's child support payments assist her with raising her son, she does not rely on them to sustain her. Mother is in the process of applying for social security disability and is also receiving support from her estranged husband, Mr. Marsh. Mother also anticipates receiving a monetary settlement as a result of a motor vehicle accident.

While the Court is concerned that Mother does not have a steady stream of income other than through child support, there is no indication that Mother has been unable to provide financially for Child's needs. Father has also been providing sufficiently for Child's needs. Thus, this factor is neutral to the Court's analysis as both parties are in compliance with their responsibilities toward Child.

### (7) Evidence of domestic violence as provided for in Chapter 7A of this title; and

Title 13 *Del. C.* § 706A(a) provides that any evidence of a past or present act of domestic violence, whether or not committed in the presence of the child, is a relevant factor that must be considered by the Court in determining the legal custody and residential arrangements in accordance with the best interests of the child. Father filed a Petition for Order of Protection from Abuse against Mother on October 8, 2012 alleging Mother was having him followed by a detective and threatening to have him fired. On November 16, 2012 the Court dismissed Father's Petition because it could not find based on a preponderance of the evidence that domestic violence occurred.

Mother testified that she and her husband, Mr. Marsh, are currently separated as a result of a domestic violence incident that occurred in their home in January of 2014. Mother stated that Mr. Marsh has anger issues and he pulled her hair during an argument. In an email from Mother to Father dated January 21, 2014 [11] Mother explained that Mr. Marsh was not allowed to have contact with her or Child because Mr. Marsh held Mother against her will and attacked her physically with threats to hurt her again. Mother admitted that criminal charges are currently pending against Mr. Marsh as a result of the incident. Mother testified that Mr. Marsh had never been violent toward her on any prior occasion and the incident may have been a result of Mr. Marsh's recent diagnosis of bipolar disorder. Both Mother and Mr. Marsh claim Child was not in the home when this incident occurred. Father, however, asserts that Child was in the home when Mr. Marsh returned to the home the day following the incident and destroyed the yard. Father recorded Child describing to his step-sister that the incident was horrible and the police came.[12]

Although Mother and Mr. Marsh separated after the incident, Mother admitted that she has had contact with Mr. Marsh on three separate occasions. Mr. Marsh came to Mother's home while the Child was inside sleeping in order to discuss some matters with Mother. Mother claims she was not afraid at the time, in spite of repeatedly asking Father not to reveal her address to Mr. Marsh. Mother

---

**11.** See Petitioner's Exhibit 4.

**12.** Petitioner's Exhibit 7.

and Child also had contact with Mr. Marsh at his daughter's basketball game and the family sat all together and Mr. Marsh was able to interact with Child. Mother also took part in a counseling session with Mr. Marsh. Mother asserted that the Maryland Court has prohibited her and Mr. Marsh from having any abusive contact but has not prohibited contact altogether. Mr. Marsh testified only that a "No Contact" Order remained in effect.

The Court is troubled that after a domestic violence incident in which charges are still pending Mother has not only had contact with Mr. Marsh but also has permitted Child to have contact with Mr. Marsh. Although Mother claims that Child was not present and did not witness the domestic violence while Father believes Child did, the effects of Mother's tumultuous relationship with Father are being felt by Child as he has been uprooted from his home. It is possible he may be uprooted again if Mother chooses to reconcile with Mr. Marsh. Though Mother claims that Mr. Marsh has never hurt her physically before, there is the possibility that if Mother returns to the home with Child that another incident could occur which the Child could witness or worse be harmed as a result thereof. Thus, the Court finds this factor weighs in favor of Father's position.

**(8) The criminal history of any party or any other resident of the household including whether the criminal history contains pleas of guilty or no contest or a conviction of a criminal offense.**

In reviewing Mother's criminal record, the Court notes that Mother was arrested on two counts of Shoplifting Under $1500 Conceals Wares or Merchandise on February 12, 2014 and the charges are currently pending. Father testified that he has been arrested in the past for three offenses which involved driving under the influence of alcohol. On January 5, 1993, Father was arrested for Operation of a Vehicle Under the Influence of Liquor or Drugs and was sentenced as a first offender. On December 14, 1994, Father was arrested for Driving a Vehicle Under the Influence of Alcohol and or Drugs and was found guilty. On November 6, 2003 Father was arrested for Reckless Driving–Alcohol Related and was found guilty. Father, however, has not have any subsequent charges regarding driving under the influence of alcohol in the past eleven years. The Court finds that neither parents' criminal history is such that it would negatively impact that custody decision and therefore is inapplicable to the Court's analysis.

### Conclusion

After considering all relevant factors, the Court finds it is in the best interest of Child for the parties to have joint legal custody with Father having primary residential custody of the Child. Factors one (1), three (3), four (4), five (5), and seven (7) favor granting Father primary residential placement of Child. Factors two (2) and (8) are inapplicable to the Court's analysis and factor six (6) is neutral. The Court is greatly concerns about the current instability in Mother's life in terms of both her relationship with her estranged husband as well as her current living situation. The Court also finds troubling testimony regarding Mother's use of prescription narcotics, her inability to ensure that Child is in school on a regular basis, and her outbursts during custody exchanges.

During the school year, Mother shall have visitation with Child every other weekend from Friday at 7 p.m. until Sunday at 7 p.m. The parties are to meet at the Wawa store on Route 13 in North Dover for the exchange and Father's wife

is not to be present during the exchange. Beginning the Monday after school ends, the Child shall alternate between the parties' homes on a week-on/week-off schedule. Thus, Mother shall have the Child every other week beginning on Monday morning at 8 a.m. The school year schedule is to resume the Monday morning the week before school begins.

The parties shall also follow the following schedule for holiday visitation: In even numbered years Mother shall have visitation with the Child from Christmas Eve at 6:00 p.m. until December 28th at 6:00 p.m. In odd numbered years, Mother will have visitation with Child from December 28th at 6:00 p.m. until January 1st at 6:00 p.m. In even numbered years, Father shall have Child on Thanksgiving Day. In odd numbered years, Mother shall have Child from 8 a.m. Thanksgiving morning through Sunday at 6 p.m. whether or not the holiday weekend falls on a weekend Mother would regularly be scheduled for visitation. For the Easter/spring break, if the break occurs the week after Mother's regularly scheduled weekend, Mother will keep Child through the following Friday evening. If the break falls on the week before Mother's regularly scheduled weekend for visitation, Mother shall have visitation with the Child from 7:00 p.m. on the Sunday evening before break begins until the following Sunday at 7 p.m. On Mother's Day and Father's Day, no matter whose turn for contact, Child shall be with the parent whose holiday is being celebrated from 10 a.m. until 6 p.m. The holiday schedule, unless otherwise specified, overrides the normal weekend visitation schedule.

**ACCORDINGLY, IT IS HEREBY ORDERED AS FOLLOWS:**

1. Custody: The parties shall have joint legal custody of the children;

2. Primary residency of Child shall be with Father

3. *Visitation:* During the school year, Mother shall have visitation with Child every other weekend from Friday at 7 p.m. until Sunday at 7 p.m. The parties are to meet at the Wawa store on Route 13 in North Dover for the exchange and Father's wife is not to be present during the exchange.

4. *Summer Vacation:* Beginning the Monday after school ends, the Child shall alternate between the parties' homes on a week-on/week-off schedule. Thus, Mother shall have the Child every other week beginning on Monday morning at 8 a.m. The parties are to meet at the Wawa store on Route 13 in North Dover for the exchange and Father's wife is not to be present during the exchange. The school year schedule is to resume the Monday morning the week before school begins.

5. *Christmas Vacation:* In even numbered years Mother shall have visitation with the Child from Christmas Eve at 6:00 p.m. until December 28th at 6:00 p.m. In odd numbered years, Mother will have visitation with child from December 28th at 6:00 p.m. until January 1st at 6:00 p.m.

6. *Thanksgiving:* In even numbered years, Father shall have Child on Thanksgiving Day. In odd numbered years, Mother shall have Child from 8 a.m. Thanksgiving morning through Sunday at 6 p.m. whether or not the holiday weekend falls on a weekend Mother would regularly be scheduled for visitation.

7. *Easter/Spring Break:* if the holiday break occurs the week after Mother's regularly scheduled weekend,

Mother will keep Child through the following Friday evening. If the break falls on the week before Mother's regularly scheduled weekend for visitation, Mother shall have visitation with the Child from 7:00 p.m. on the Sunday evening before break begins until the following Sunday at 7 p.m.

8. ***Mother's/Father's Day:*** On Mother's Day and Father's Day, no matter whose turn for contact, the Child shall be with the parent whose holiday is being celebrated from 9 a.m. until 6 p.m.;

9. Each party shall be entitled to frequent telephone and electronic communication with the children when in the care of the other parent.

10. The parties may modify the visitation/holiday/school break/summer vacation schedule by mutual agreement in writing.

